IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CHRIS HOGAN, an individual,<br><br>     Plaintiff,<br><br><br><br>       vs.<br><br>MICHAEL K. WINDER, in his official capacity as Mayor of West Valley City, Utah and in his individual capacity; WEST VALLEY CITY, UTAH, a municipal corporation; KEVAN BARNEY; THE SUMMIT GROUP; DAVID SHAW, in his individual capacity; KIRTON & McCONKIE, P.C.; TODD MARRIOTT, in his individual capacity; GARY JONES, in his individual capacity; KANE LOADER, in his individual capacity; UTAH TELECOMMUNCIATION OPEN INFRASTRUCTURE AGENCY aka UTOPIA; DESERET DIGITAL MEDIA, INC.; SEAN BUCKLEY; FIERCEMARKETS, INC.; DONALD J. RZESZUT; and DOES 1-100.<br><br>     Defendants. | MEMORANDUM DECISION AND ORDER ON MOTIONS TO DISMISS AND MOTIONS FOR JUDGMENT ON THE PLEADINGS<br><br><br><br>Case No. 2:12-CV-123 TS |

This matter is before the Court on Defendant West Valley City's Motion to Dismiss;

Defendant Deseret Digital Media's ("DDM") Motion for Judgment on the Pleadings; Defendant

Michael K. Winder's (in his Individual Capacity) Motion for Partial Joinder with West Valley City

1

in its Motion to Dismiss and his Motion for Joinder with DDM's Motion for Judgment on the Pleadings; Defendants Kevan Barney and The Summit Group's ("TSG") Motion for Judgment on the Pleadings and Joinder in DDM's Motion for Judgment on the Pleadings; Defendants Kirton & McConkie ("Kirton") and David Shaw's Motion for Judgment on the Pleadings and Joinder in Motions for Judgment on the Pleadings of DDM, TSG, and Barney; Defendants Sean Buckley and Questex Media Group's (collectively "Buckley") Motion for Joinder in DDM's Motion for Judgment on the Pleadings; Defendants Gary Jones, Kane Loader, Todd Marriott, and Utah Telecommunications Open Infrastructure Agency's ("UTOPIA") (collectively "UTOPIA Defendants") Motion for Judgment on the Pleadings; and Defendant Donald J. Rzeszut's Motion to Dismiss.

For the reasons set forth below, the Court will grant the Motions to Dismiss and Motions for Judgment on the Pleadings.

## I.   BACKGROUND

The following statement of the case is drawn from Plaintiff's First Amended Complaint and the documents referenced therein.

This suit arises out of Plaintiff Chris Hogan's employment with UTOPIA as a marketing consultant in 2008.   UTOPIA is a group of sixteen Utah cities that have joined together to create a fiber-optic network in Utah.   In 2011, Hogan became concerned with what he perceived to be a conflict of interest between a company bidding a job for UTOPIA and one of UTOPIA's board members.   According to Hogan, because he raised the issue with UTOPIA executives, he was fired.

West Valley City is a UTOPIA member.   Defendant Michael Winder, as mayor of West Valley City, had some involvement with UTOPIA.   Immediately after Hogan was fired, Winder called him to inquire about the circumstances.   Hogan and Winder met and Hogan outlined the same concerns he had expressed to UTOPIA executives.

Hogan thereafter instructed his counsel to draft a complaint alleging wrongful termination and serve it on the chairman of UTOPIA's board, Kane Loader.   A letter that accompanied the draft explained that Hogan intended to sue but would be amenable to negotiating a resolution. This was followed by a demand letter and further correspondence between the parties.   According to Plaintiff, UTOPIA's attorney, David Shaw, sent Hogan a letter in which he accused Hogan of blackmail and extortion.

Eventually, UTOPIA filed for a temporary restraining order ("TRO") and a preliminary injunction to prohibit Hogan from disclosing any information he had obtained during his employment.   That action was filed in state court on April 18, 2011.   On April 19, the court granted the TRO, sealed the record, and set a hearing for April 26 to determine whether a preliminary injunction was justified.

On April 25, 2011, Hogan filed a complaint with this Court.[1]   UTOPIA thereafter moved to seal the complaint.   On April 26, 2011, the state court determined that a preliminary injunction was not appropriate, but reserved the issue of whether to unseal the record.   The next day, UTOPIA filed a motion to dismiss the case voluntarily, as well as a withdrawal of its motion to

---

[1]Complaint, 1:11-cv-64.

3

seal the record in the state case.   UTOPIA also withdrew its request to seal the complaint filed by

Hogan in this Court.

According to Hogan, Winder and others involved with UTOPIA then decided to use the

media to undermine Hogan's claims.   Hogan alleges that the UTOPIA Defendants, UTOPIA's

attorney Shaw, Kirton, UTOPIA's public relations firm TSG, and TSG employee Kevan Barney

all participated in the conspiracy.   As part of this conspiracy, Winder informed the others that he

had means through which he could publish an article about Hogan.   The others apparently then

helped devise the plan or helped Winder gain access to court records upon which he would base his

article.

On May 1, 2011, KSL.com published an article (the "KSL Article") written by Winder

under the pseudonym Richard Burwash.   The KSL Article was titled "Former UTOPIA

Contractor Accused of Extortion."   The article states that Hogan was terminated for "performance

issues," that he had been behaving erratically, and had been accused of extortion.[2]   The KSL

Article was later republished by third parties a number of times.

On May 2, 2011, FierceMarkets published an article (the "FierceTelecom Article") on

FierceTelecom.com by Sean Buckley, a senior editor at FierceMarkets.   The article's headline

read, "UTOPIA contractor faces extortion charges."   On May 5, 2011, Donald J. Rzeszut

republished the FierceTelecom Article in its entirety on his website FiberToTheWhatever.com.

Hogan subsequently filed this suit claiming that West Valley City, Winder, Shaw, Kirton,

and the UTOPIA Defendants deprived him of his right to pursue gainful employment under 42

---

[2]Docket No. 41 Ex. 1, at 1.

4

U.S.C. § 1983.[3]   He also claims that the same Defendants together with Barney and TSG violated

his rights under 42 U.S.C. § 1985 by engaging in a civil conspiracy to retaliate against Hogan for

having attended court.   Hogan also brings claims for defamation, false light invasion of privacy,

and intentional infliction of emotional distress against all Defendants other than West Valley City.

Finally, Hogan brings a civil conspiracy claim against Winder, Barney, TSG, Kirton, Shaw, and

the UTOPIA Defendants.   Defendants move the Court to dismiss these causes of action for failure

to state a claim and for judgment on the pleadings.

## II.   STANDARD OF REVIEW

"A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss

under Rule 12(b)(6),"[4]   The same standard is used when evaluating 12(b)(6) and 12(c) motions.[5]

In considering a motion to dismiss for failure to state a claim upon which relief can be

granted under Rule 12(b)(6), all well-pleaded factual allegations, as distinguished from conclusory

allegations, are accepted as true and viewed in the light most favorable to Plaintiff as the

nonmoving party.[6]   Plaintiff must provide "enough facts to state a claim to relief that is plausible

on its face,"[7] which requires "more than an unadorned, the-defendant-unlawfully-harmed-me

---

[3]Plaintiff originally also brought a § 1983 claim based on invasion of privacy but has since
agreed that that claim should be dismissed.

[4]*Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000)
(citing *Mock v. T.G. & Y. Stores Co.*, 971 F.2d 522, 528 (10th Cir. 1992)).

[5]*Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 n.2 (10th Cir. 2002).

[6]*GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[7]*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

accusation."[8]   "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'   Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[9]   "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[10]   As the Court in *Iqbal* stated,

> only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.   But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged "but it has not show[n]" that the pleader is entitled to relief.[11]

In considering the adequacy of a plaintiff's allegations in a complaint subject to a motion to dismiss, a district court not only considers the complaint, but also "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[12]   Thus,

> notwithstanding the usual rule that a court should consider no evidence beyond the pleadings on a Rule 12(b)(6) motion to dismiss, "[a] district court may

---

[8]*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[9]*Id.* (quoting *Twombly*, 550 U.S. at 557) (alteration in original).

[10]*Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

[11]*Iqbal*, 556 U.S. at 679 (alteration in original) (internal quotation marks and citations omitted).

[12]*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citing 5B Wright & Miller § 1357 (3d ed. 2004 & Supp. 2007)).

consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."[13]

## III.   DISCUSSION

A.      § 1983 CLAIMS AGAINST WEST VALLEY

As a threshold matter, the Court notes that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."[14]   Accordingly, the Court will address claims against Winder in his official capacity as claims against West Valley City.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."[15]   Where a plaintiff seeks to impose § 1983 liability on a municipality, it is not enough for plaintiff to show that an employee of the municipality was a wrongdoer.[16]   Rather, plaintiff must show that the "execution of a government's policy or custom" caused plaintiff's injury.[17]

The parties have provided extensive argument on the issue of whether the publication of the KSL Article was "a policy or custom," therefore giving rise to municipal liability.   However, for reasons set forth more fully below, Hogan has failed to show that Winder was acting under

---

[13]*Brown v. Montoya*, 662 F.3d 1152, 1166 (10th Cir. 2011) (citing *Alvarado v. KOB-TV, LLC*, 493 F.3d 120, 1215 (10th Cir. 2007)).

[14]*Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

[15]*West v. Atkins*, 487 U.S. 42, 48 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

[16]*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 ("[W]e conclude that a municipality cannot be held liable solely because it employs a tortfeasor.").

[17]*Id.* at 713.

7

color of state law when he published the article in question.   Accordingly, the Court will reject Hogan's § 1983 claims against Winder on that basis without considering whether Winder's actions could give rise to municipal liability.

In *West v. Atkins*, the Supreme Court stated that "[t]he traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"[18]   Thus, to survive dismissal, Plaintiff must allege facts that, taken as true, would show that Winder (1) was exercising government power when he wrote and published the article and (2) that his exercise of that power was possible only because of his government position. Hogan fails on both counts.

The Tenth Circuit considered a similar situation in *Hall v. Witteman*.[19]   In that case, plaintiff Hall had paid a newspaper to run an advertisement urging voters not to support a local judge running for reelection.   The newspaper ran the ad for one day, but on the second day ran an ad created by a group of attorneys soliciting support for the judge.   Included among the attorneys was defendant Witteman, who signed the ad using his official title: "Coffey County Attorney." Hall alleged that Witteman used "the power of his offices" to supplant Hall's advertisement with Witteman's own.   This, Hall alleged, was a violation of his First Amendment rights by a state

---

[18]487 U.S. at 49.

[19]584 F.3d 859, 859 (10th Cir. 2009).

actor.   The court disagreed, finding that Plaintiff had failed "to describe any use of governmental power by Mr. Witteman" and therefore there was no state action.[20]

Hogan's Complaint suffers from the same deficiencies as Hall's—it contains no allegations to support the proposition that Winder used his authority as mayor to write the article or get it published.   In fact, Hogan does not describe the process by which Winder got the article into the newspaper in any detail.   As such, the Court can hardly find that Hogan's facts, taken as true, establish that Winder "exercised power possessed by virtue of state law" when he published the article, and that his actions were "made possible only because [he was] clothed with the authority of state law."[21]

Hogan would prefer that the Court adopt a much broader view of state action than that expressed in *West v. Atkins*—one that finds state action whenever a government official is doing something that "relate[s] to his responsibilities with the government, he acts under color of state law,"[22] "no matter the hour or where he is, whether at [his] offices, in the community, or at his home."[23]   Hogan's hope that the Court would do so explains his failure to allege facts relevant to the *West v. Atkins* standard, relying instead on allegations that Winder's article relates to his duties as mayor, and how he must have been motivated by those duties when writing, regardless of what name he used.

---

[20]*Id.* at 865.

[21]*West*, 487 U.S. at 42.

[22]Docket No. 75, at 22.

[23]Docket No. 41, at 37–38.

The Court declines to expand the *West v. Atkins* standard as Hogan suggests.   While many of the things Mayor Winder does may benefit, or relate to, West Valley City, not all of them are mayoral.   State action cannot hinge on whether Winder's actions simply related to or benefitted the city, or even whether he intended them to do so.   Rather, as the Supreme Court has firmly stated, the determinative question is whether Winder (1) used the power of his office to act and (2) was able to act only because of that power.[24]   Winder clearly intended to divorce himself from, not brandish, his government power by posing as a private citizen when writing the article.   At most, Hogan has simply alleged that Winder must have been acting to protect West Valley City's interests when he wrote the article.   Faced with a dearth of allegations, the Court is compelled to find that Hogan has failed to sufficiently plead state action, and that Winder's behavior "is simply not actionable under § 1983, however . . . wrongful the conduct is."[25]

In light of the foregoing, the Court need not further review Hogan's municipal liability arguments.

B.     § 1983 CLAIMS AGAINST WINDER, KIRTON, SHAW, UTOPIA DEFENDANTS.

Hogan has alleged three federal causes of action against Winder in his individual capacity.

Personal-capacity suits . . . seek to impose individual liability upon a government officer for actions taken under color of state law.   Thus, "[o]n the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right."[26]

---

[24]*West*, 487 U.S. at 42.

[25]*Hall*, 584 F.3d at 864 (quoting *Jojola v. Chavez*, 55 F.3d 488, 492 (10th Cir. 1995)).

[26]*Hafer v. Melo*, 502 U.S. 21, 25 (1991).

Because Winder was not acting under color of state law, there can be no § 1983 individual liability claims against him.

Plaintiff also has not alleged facts to show that Kirton, Shaw, or the UTOPIA Defendants acted under color of state law.   Hogan does not allege facts that show (1) that Kirton, Shaw, or any of the UTOPIA Defendants used the power of their respective offices to conspire with Winder or (2) that they were able to act only because of that power.   In his Amended Complaint, Plaintiff does no more than name each of the Defendant's offices in their respective organizations.   He does not allege that they used the power of their offices to publish the KSL Article or that publication was possible only because of that power.   Accordingly, the Court will dismiss Hogan's § 1983 claims against Kirton, Shaw, and the UTOPIA Defendants.

C.      § 1985(2) AGAINST WEST VALLEY CITY

Plaintiff also argues that (1) Winder wrongfully conspired with other Defendants to retaliate against Hogan for filing suit in this Court in violation of 42 U.S.C. § 1985(2) and (2) West Valley City can be held liable for Winder's actions under the doctrine of *respondeat superior*.

Federal courts have routinely held that a municipality cannot be liable for a civil conspiracy unless the City could actually be said to have participated through policy or custom.[27]

---

[27]*See, e.g., Owens v. Haas*, 601 F.2d 1242, 1247 (2d Cir. 1979) ("Since under [*Monell*], a local body is a 'person' for the purposes of [§] 1983, we assume that the same definition of 'person' would apply to [§] 1985, which allows damages whenever two or more 'persons' conspire to violate the civil rights of another.   Again the county could not be held liable on a Respondeat superior theory."); *Eiland v. Hardesty*, 564 F. Supp. 930, 934 (N.D. Ill. 1982) ("To state a claim against a city under § 1985 the complaint must allege an official policy or custom which relates to matters stemming from or resulting in the conspiracy. . . .   The city's liability will only rest upon its own actions, rather than on the theory of *respondeat superior*."); *Maisonet v. City of Phila.*, 2007 WL 1366879, *3 (E.D. Pa. May 7, 2007) ("[C]laims brought under § 1985 must allege that

In his opposition memorandum to West Valley City's Motion, Hogan contends that West Valley City is liable for the conspiracy "through Winder."[28]   Then, in his opposition to Winder's Motion, Hogan argues that the city is liable under § 1985 "based on the doctrine of *respondeat superior.*"[29]   The Court takes this to mean that Hogan is not alleging that a policy or custom caused West Valley City to be directly involved in the conspiracy.   Accordingly, the Court will dismiss the § 1985 claim against West Valley City.

D.   §1985(2) CLAIMS AGAINST OTHERS

Hogan also claims that Winder, Barney, TSG, Shaw, Kirton, and the UTOPIA Defendants conspired against him in violation of § 1985 on account of his having filed suit in federal court. This claim requires that "two or more persons in any State or Territory conspire" to injure "any party or witness in any court of the United States . . . on account of his having" attended court.[30] The elements of this claim are (1) a conspiracy, (2) to injure a person on account of having attended court, and (3) injury to the plaintiff.[31]

---

the underlying constitutional deprivation resulted from an official municipal policy or custom."); *Saviour v. Kansas City, Kan.*, 1992 WL 135019, at *7 (D. Kan. May 15, 1992) ("[A] municipality cannot be held liable under § 1985(3) on a respondeat superior theory.").

[28]Docket No. 75, at 4.

[29]Docket No. 87, at 3.

[30]42 U.S.C. § 1985(2); *see also Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1126 (10th Cir. 1994).

[31]*Cf. id.* at 1126 (stating that the elements of a § 1985 deterrence claim are "(1) a conspiracy, (2) to deter by testimony by force or intimidation, and (3) injury to the plaintiff") (citing *Rutledge v. Ariz. Bd. of Regents*, 859 F.2d 723, 735 (9th Cir. 1988)).

"The first element, a conspiracy, 'requires the combination of two or more persons acting in concert.'"[32]   Hogan must "allege[] sufficient facts to create an inference of a 'meeting of the minds' of the conspirators" and "[t]he conspiracy must be one that has the requisite statutory purpose, namely to [injure] a party or witness"[33] on account of his having attended court.

        In support of his conspiracy claim Hogan alleges that even though the records in the state lawsuit were sealed at the time the KSL Article was written, Winder reported in the KSL Article that the records had been unsealed.   According to Hogan, the "only way Winder could have formed the belief that the records had been unsealed was through employees of [Kirton] (including Shaw) or through employees of UTOPIA (including Marriott)."[34]   Hogan also alleges that TSG employed Winder when Winder wrote the KSL Article, that TSG acted as UTOPIA's public relations firm, and that "Winder proposed public relations strategies . . . for UTOPIA and UTOPIA's marketing department."[35]   Finally, Hogan asserts that "Winder, Marriott, and Shaw agreed to use the court documents to defame Hogan,"[36]   "Barney, an employee of [TSG] also participated in the publication of the KSL Article,"[37] and "UTOPIA's decisions resulting in the

---

[32]*Brever* 40 F.3d at 1126 (quoting *Abercrombie v. City of Catoosa*, 896 F.2d 1228, 1230 (10th Cir. 1990)).

[33]*Id.* (quoting *Brown v. Chaffee*, 612 F.2d 497, 502 (10th Cir. 1979)).

[34]Docket No. 41, at 25.

[35]*Id.* at 48.

[36]*Id.*

[37]*Id.*

publication of the KSL Article were made or ratified by UTOPIA officials or employees . . . including Shaw, Marriott, Jones, and Loader."[38]

The Court finds that these allegations are far from sufficient to infer a "meeting of the minds" of the alleged conspirators.   Even under the deferential standard the Court uses to review a motion to dismiss, Hogan has simply alleged too few facts to establish the plausibility of a conspiracy.

Hogan's allegations against Shaw are insufficient to state a claim for conspiracy because, even assuming the court documents Winder allegedly used to write the KSL Article came from Shaw or a UTOPIA employee, this shows only that it is possible—not plausible—that Shaw was involved.   And Plaintiff's allegation that Shaw agreed to use the court documents to defame Hogan is a legal conclusion entitled to no weight on a motion to dismiss.

Plaintiff's first allegation against UTOPIA is the same as that against Shaw: the court documents used to publish the KSL Article must have come from either UTOPIA or Shaw.   Even assuming that a UTOPIA employee showed the sealed court documents to Winder, this does not implicate UTOPIA in a conspiracy to publish the KSL Article.   As Winder had an interest in litigation between UTOPIA and Hogan, he may have wanted (and UTOPIA may have provided) the documents for any number of reasons.   As the remaining allegations against the UTOPIA Defendants are nothing more than legal conclusions they are entitled to no weight.

The Court also finds that Hogan's allegations that TSG employed Winder at the time Winder published the KSL Article, that TSG acted as UTOPIA's public relations firm, and that

---

[38]*Id.* at 49.

Winder proposed public relations strategies for UTOPIA are also insufficient to create an inference of conspiracy.   Similarly, Hogan's allegation that Barney participated in the publication of the KSL Article is a bare allegation devoid of further factual development.

As Plaintiff has not stated a claim for conspiracy, his § 1985(2) claim against all Defendants must fail.   Additionally, because (as discussed below) Plaintiff has not sufficiently plead any of his state-law claims, the injury requirement of his § 1985(2) is not satisfied.   Because Plaintiff's state-law claims against TSG, Barney, Shaw, Kirton, and the UTOPIA Defendants are premised on their having participated in the conspiracy, the Court will dismiss Plaintiff's claims against these Defendants.

All that remains, then, are Plaintiff's state-law claims against Winder, DDM, Buckley, and Rzeszut.

E.     STATE-LAW CLAIMS AGAINST DDM AND WINDER

Plaintiff brings state-law claims of defamation,[39] false light invasion of privacy, civil conspiracy, and intentional infliction of emotional distress against DDM and Winder.

1.     DEFAMATION

To state a claim for defamation, Hogan must establish "that the defendants published the statements concerning him, that the statements were false, defamatory, and not subject to any privilege, that the statements were published with the requisite degree of fault, and that their

---

[39]Although Plaintiff's Amended Complaint states claims for both defamation per se and defamation per quod, Plaintiff does not dispute that the only distinction between those claims is the type of damages he must plead.   Thus, the distinction has no effect on whether the alleged statements are capable of conveying defamatory meaning or on the applicability of any of Defendants' affirmative defenses.   Therefore, at this stage of the proceedings, the Court will treat defamation per se and defamation per quod as the same claim.

publication resulted in damage."[40]   "[A] statement is defamatory if it impeaches an individual's honesty, integrity, virtue, or reputation and thereby exposes the individual to public hatred, contempt, or ridicule."[41]

In the present case, it is undisputed that the KSL Article concerns Hogan.   For purposes of the currently pending motions, the Court must accept Hogan's allegations that Defendants published the article, that the alleged implications from the article are false, and that he suffered damage as a result.   Thus, "the threshold issues are whether the [KSL Article is] capable of sustaining a defamatory meaning and whether any qualified or absolute privileges preclude [Hogan's] claim[s]."[42]

"Whether a statement is capable of sustaining a defamatory meaning is a question of law"[43] to be decided by the Court.   "[I]n determining whether a particular statement fits within the rather broad definition of what may be considered defamatory, the guiding principle is the statement's tendency to injure a reputation in the eyes of its audience."[44]   Furthermore, "[b]ecause expressions of pure opinion fuel the marketplace of ideas and because such expressions are incapable of being verified, they cannot serve as the basis for defamation liability."[45]

---

[40] *West v. Thomson Newspapers*, 872 P.2d 999, 1007–08 (Utah 1994).

[41] *Zoumadakis v. Uintah Basin Med. Ctr., Inc.*, 2009 WL 1423559, at *1 (Utah Ct. App. 2009) (quoting *Thomson Newspapers*, 872 P.2d at 1003–04) (alteration in original).

[42] *Thomson Newspapers*, 872 P.2d at 1008.

[43] *Id.*

[44] *Id.*

[45] *Id.* at 1015.

The KSL Article contains two general categories of statements that Hogan believes are defamatory.   First, the article contains statements that he was terminated for performance issues and that he exhibited erratic behavior.   Second, according to Hogan, the article contains statements that imply he was criminally charged with extortion and that he was, in fact, an extortionist.

As an initial matter, the Court notes that Plaintiff appears to have abandoned his claim that the statements that he was terminated for performance issues and that he exhibited erratic behavior are defamatory.   Regardless of Plaintiff's current position on those claims, however, the Court will dismiss them because, as discussed below, the statements are non-actionable opinion.

To determine whether a statement is fact or opinion the Court considers the following four factors:

> (i) the common usage or meaning of the words used; (ii) whether the statement is capable of being objectively verified as true or false; (iii) the full context of the statement—for example, the entire article or column—in which the defamatory statement is made; and (iv) the broader setting in which the statement appears.[46]

As to the first factor, the words "performance" and "erratic" are both words commonly used to convey one's subjective belief about another's ability or behavior.   Additionally, because the words convey a subjective belief, it is not possible—under the second factor—to objectively verify whether the statements are true or false.   Thus, these factors weigh heavily in favor of finding that the statements constitute opinion.

---

[46]*Id.* at 1018.

The context of the KSL Article also shows that the statements were made by biased individuals.   The KSL Article communicates that Hogan was in an employment dispute with UTOPIA, his former employer.   It also attributes the "performance issues" statement to Kane Loader, a UTOPIA representative, and the "erratic behavior" statement to a UTOPIA vendor. Therefore, the context of the article also suggests that the statements are opinion.

Looking at the article's broader setting, Plaintiff argues that because the KSL Article did not appear as an editorial, readers would expect it to contain hard facts, not opinion.   But just because an article is not an editorial does not mean the article will not contain opinions.   Indeed, that someone holds a particular opinion is a verifiable fact that may qualify as hard news if it is newsworthy.   That is the case here.   The article's author, while not expressing any personal opinion, relays—as a hard fact—that others hold personal opinions that Hogan's employment contract was not renewed because of performance issues and his "erratic" behavior.

In sum, these factors compel the Court to find that the statements about performance issues and erratic behavior are mere opinion.   Therefore, the Court will dismiss Plaintiff's claims regarding them.

Next, Plaintiff alleges the article implies he was criminally charged with extortion and that he was an extortionist.   Because this claim is based on the implications of statements in the article, and not on the statements themselves, "this is a defamation-by-implication claim."[47]

As a preliminary matter, Defendants argue that to state a claim for defamation by implication, Plaintiff must plead facts that show a jury could find, by clear and convincing

---

[47]*Id.* at 1011.

evidence, that the publisher actually intended to convey the defamatory implication.   In support of

this argument, Defendant cites *Chapin v. Knight-Ridder, Inc*., a Fourth Circuit case that required a

libel-by-implication plaintiff to show not just that an article is susceptible to a false implication,

but that the defendant intended the implication.[48]   In that case, the court found that "because the

constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially

rigorous showing where the expressed facts are literally true."[49]

       To the Court's knowledge, no Utah court has directly ruled on this issue.   However, the

requirement that a plaintiff in a libel-by-implication case show that the defendant intended the

implication is grounded in the First Amendment, and is therefore an issue of federal—not

state—law.   In light of the magnitude of the First Amendment liberties at stake and the fact that

"the theory of libel by implication would allow a jury to draw whatever inferences it wished from

---

[48]*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092–93 (4th Cir. 1993).

[49]*Id.*; *see also Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 528 (6th
Cir. 2007) ("[W]here the plaintiff is claiming defamation by innuendo, he . . . must show with clear
and convincing evidence that the defendant . . . intended or knew of the implications that the
plaintiff is attempting to draw from the allegedly defamatory material." (quoting *Saenz v. Playboy
Enters., Inc.*, 841 F.2d 1309, 1318 (7th Cir. 1998) (internal quotation marks omitted)); *White v.
Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990) ("If a communication . . . merely
conveys materially true facts from which a defamatory inference can reasonably be drawn, the
libel is not established.   But if the communication . . . supplies additional, affirmative evidence
suggesting that the defendant *intends* or *endorses* the defamatory inference, the communication
will be deemed capable of bearing that meaning."); *Sassone v. Elder*, 626 So. 2d 345, 354 (La.
1993) ("[A]dequate protection of freedom of the press at least requires that the plaintiffs prove that
the alleged implication is the *principal* inference a reasonable reader or viewer will draw from the
publication as having been intended by the publisher.").

statements of fact,"[50] the Court is inclined to require that Plaintiff allege facts sufficient to show that Defendants intended the implication.   But because, as discussed below, Plaintiff has not alleged facts that meet the lower standard of showing the statements are susceptible to a defamatory interpretation, the Court need not decide this issue.   The Court will therefore approach this case as the Utah Supreme Court did in *West v. Thomson Newspapers*, by considering whether the KSL Article is "capable of sustaining a defamatory meaning."[51]

To determine whether the article is susceptible to a defamatory interpretation, the Court must determine (1) whether the implication Hogan claims can be drawn from the article is capable of sustaining a defamatory meaning and (2) whether that implication could reasonably be drawn from the article itself.

The first point is easily decided.   Hogan claims that the KSL Article implies that he was facing formal extortion charges and that he was an extortionist.   Either of these implications would "injure [Hogan's] reputation in the eyes of [the KSL Article's] audience."[52]   Furthermore, under Utah law, words that charge criminal conduct are defamatory per se.[53]   In this case, Hogan claims that the article implies he has been criminally charged with the crime of extortion.   The Court finds that these alleged implications are capable of sustaining a defamatory meaning.

---

[50]Robert D. Sack, Sack on Defamation: Libel, Slander & Related Probs. § 2:4.5 (2012).

[51]872 P.2d at 1008.

[52]*Id.*

[53]*Baum v. Gillman*, 667 P.2d 41, 43 (Utah 1983) ("In order to constitute defamation per se, the defamatory words must charge criminal conduct, loathsome disease, conduct that is incompatible with the exercise of a lawful business, trade, profession, or office, or the unchastity of a woman.").

The Court must next consider the second point: whether either the implication that Plaintiff was criminally charged with extortion or the implication that he was an extortionist could reasonably be drawn from the KSL Article.

The KSL Article contains three references to extortion.   The first extortion reference is in the article's headline which reads: "Former UTOPIA contractor accused of extortion."[54]   The second extortion reference is in the article's first paragraph and it states that Hogan "is being accused of extortion in court documents that were unsealed in Utah's 3rd District Court."   Finally, the third reference to extortion is in the article's fourth paragraph and it includes the statement, "What Mr. Hogan attempts in proposing this extravagant course go[es] by the names of 'blackmail' and 'extortion.'"   This final statement was made by "UTOPIA attorney David Shaw in an April 4 reply, unsealed Wednesday."

To determine which implications can reasonably be drawn from the article, the Court "must carefully examine the context in which the statement was made."[55]   While Utah law does not address this precise issue, a majority of jurisdictions consider an article's context to include both the headline and the body of the article.[56]   The Court will adopt this approach as it is "more

---

[54]Docket No. 41 Ex. 1, at 3.

[55]*Thomson Newspapers*, 872 P.2d at 1008.

[56]*See, e.g.*, *Cmty. Newspaper Holdings, Inc. v. King*, 682 S.E.2d 346, 349 (Ga. App. 2009) ("A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it.   So the whole item, including [head]lines, should be read and construed together, and its meaning and signification thus determined."); *Cole Fischer Rogow, Inc. v. Carl Ally, Inc.*, 288 N.Y.S.2d 556, 561 (N.Y. App. Div. 1968); *Molin v. Trentonian*, 687 A.2d 1022, (N.J. Super. Ct. App. Div. 1997) ("[T]he majority of jurisdictions support the rule that headlines are to be construed in conjunction with their accompanying articles."); Rodney A. Smolla, 1 Law of Defamation § 4:27 (2d ed. 2012) ("The

consistent with the general common-law principle that the alleged defamatory speech is to be construed in context."[57]

Plaintiff claims that the article's headline and first sentence create a "false implication that [he] was facing formal extortion charges" and "set the overall tone that the article is reporting on extortion."[58]   Specifically, he contends that the extortion reference in the article's first paragraph implies he was criminally charged with extortion because "[b]eing accused in court documents of extortion is synonymous with being formally charged with extortion."[59]

Defendants respond that the body of the article neither implies that Hogan was criminally charged with extortion or was in fact an extortionist because all the statements related to these alleged implications were made by partisan advocates in the heat of contentious civil litigation. The Court agrees.

The article clearly communicates that the extortion statements were made in the context of heated civil litigation.   To begin with, the article makes no mention of any criminal case, but instead states that there were two civil suits.   In one, Hogan "accuse[d] Marriott of favoring a neighbor for a potential employment position, favoring a company that employed Marriott's brother for a bid, and other complaints of mismanagement."[60]   In the other, UTOPIA attorney

---

majority approach is not to construe the headline alone, but to construe it in conjunction with the article as a whole, to determine whether it is capable of sustaining a defamatory meaning.") (internal citations omitted).

[57]Smolla, 1 Law of Defamation § 4:27.

[58]Docket No. 89, at 2–3.

[59]*Id.*

[60]Docket No. 41 Ex. 1, at 1.

Shaw accused Hogan of blackmail and extortion.   Additionally, in pre-litigation correspondence with UTOPIA, Hogan's counsel had threatened to file a lawsuit and noted that it would bring unfavorable public scrutiny to UTOPIA.

That the extortion references in the article's headline and first paragraph are not specifically attributed to Shaw does not, as Plaintiff argues, imply they referred to a criminal charge of extortion.   In addition to the fact that the article makes no mention of any criminal case, the article states that Shaw's extortion statement was contained in a "reply" that was "unsealed Wednesday," the same day that the court documents containing the extortion reference in the article's first paragraph were unsealed, strongly suggesting that both extortion statements came from the same civil case.

Given this context, the Court finds that reasonable readers would "have perceived that the word [extortion] was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [Hogan's] negotiating position extremely unreasonable," rather than a reference to charged criminal conduct.[61]

Similarly, because of this context, reasonable readers would not be "apt to take [the related statement that Hogan had threatened to bring unfavorable public scrutiny] at face value."[62] Because this statement forms the crux of Plaintiff's argument that the article implies he was actually an extortionist, that argument also must fail.   Therefore, the KSL Article is not susceptible to defamatory meaning and the Court will dismiss this claim.

---

[61]*Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 13-14 (1970).

[62]*Mast v. Overson*, 971 P.2d 928, 933 (Utah Ct. App. 1988).

2.      FALSE LIGHT INVASION OF PRIVACY

To bring a false light invasion of privacy claim, the false light "must be highly offensive to a reasonable person."[63]   "For essentially the same reasons that the [KSL Article] was not susceptible to a defamatory meaning, it was not highly offensive to a reasonable person."[64]   The Court will therefore dismiss this claim.

3.      INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

To bring a claim for intentional infliction of emotional distress, Plaintiff must allege facts that, taken as true, establish that Defendants

> intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable person would have known that such would result; and his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality.[65]

Plaintiff's intentional infliction of emotional distress claim is based on DDM and Winder's having published the KSL Article.   As the KSL Article is not subject to a defamatory interpretation, it can hardly be said that the article was so "outrageous and intolerable that [it] offend[s] against the generally accepted standards of decency and morality."[66]   Therefore, the Court will dismiss this claim.

---

[63]*Cox v. Hatch*, 761 P.2d 556, 564 (Utah 1988) (citation omitted).

[64]*Id.* (internal quotation marks and citation omitted).

[65]*Bennett v. Jones, Waldo, Holbrook & McDonough*, 70 P.3d 17, 30 (2012).

[66]*Id.*

F.       STATE-LAW CLAIMS AGAINST BUCKLEY AND RZSEZUT

Plaintiff brings state-law claims of defamation, false light invasion of privacy, and intentional infliction of emotional distress against Buckley and Rzeszut.   These claims are based not on the KSL Article, but on a very similar article that Buckley wrote (the "FierceTelecom Article") using the KSL Article as source material.   After Buckley published the FierceTelecom Article on the website FierceTelecom.com, Rzeszut re-published the article on a website he operates called FiberToTheWhatever.com.

1.       DEFAMATION

Plaintiff claims that the FierceTelecom Article is defamatory on its face, because it states that Hogan was facing criminal charges, and by implication, because it implies that he was being prosecuted for extortion.

The Court first notes that because the FierceTelecom Article and the KSL Article are so similar, the Court's analysis of Plaintiff's defamation claims as they relate to the KSL Article applies with equal force to his claims related to the FierceTelecom Article.   The Court will therefore dismiss Plaintiff's defamation claims against Buckley and Rzeszut.

The only difference worth noting is that the FierceTelecom Article's headline states that Hogan was facing extortion "charges" while the KSL Article said that Hogan was being "accused" of extortion.   Although the FierceTelecom Article's headline could otherwise be defamatory, any defamatory meaning is vitiated by the text in the body of the article which makes no mention of criminal charges or a criminal case.[67]   Instead, it contains the statement that Hogan had "been

_____

[67]*See cases* cited *supra* note 56.

25

accused of extortion," UTOPIA attorney Shaw's statement that Hogan's lawsuit amounted to blackmail and extortion, and Hogan's attorney's statement that a lawsuit would bring unfavorable public scrutiny to UTOPIA.   In light of the heated civil context in which these statements were made, the Court cannot find that a reasonable reader would interpret the article to mean that Hogan had been criminally charged with extortion.

2.      OTHER STATE-LAW CLAIMS

For the same reasons that the Court will dismiss Plaintiff's false light invasion of privacy and intentional infliction of emotional distress claims against DDM and Winder, the Court will dismiss these claims against Buckley and Rzeszut.

G.      PRIVILEGES

As neither of the articles is susceptible to a defamatory interpretation, the Court will not decide the applicability of privileges raised by Defendants.

### III.      CONCLUSION

Based on the foregoing, it is therefore

ORDERED that Defendant West Valley City's Motion to Dismiss (Docket No. 55) is GRANTED.   It is further

ORDERED that Defendant Rzeszut's Motion to Dismiss (Docket No. 57) is GRANTED. It is further

ORDERED that Defendant DDM's Motion for Judgment on the Pleadings (Docket No. 60) is GRANTED.   It is further

ORDERED that Defendant Winder's Motion for Joinder with Deseret Digital Media, Inc. in its Motion for Judgment on the Pleadings (Docket No. 63) is GRANTED.   It is further

ORDERED that Defendants Barney and TSG's Motion for Judgment on the Pleadings (Docket No. 69) is GRANTED.   It is further

ORDERED that Defendant Winder's Motion for Partial Joinder with West Valley City in its Motion to Dismiss (Docket No. 71) is GRANTED.   It is further

ORDERED that Defendants Kirton and Shaw's Motion for Judgment on the Pleadings (Docket No. 77) is GRANTED.   It is further

ORDERED that Defendants Buckley's Motion for Joinder in the Motion for Judgment on the Pleadings Filed by Deseret Digital Media (Docket No. 80) is GRANTED.   It is further

ORDERED that UTOPIA Defendants' Motion for Judgment on the Pleadings (Docket No. 82) is GRANTED.   It is further

ORDERED that Defendant West Valley City's Motion to Dismiss (Docket No. 21) is DENIED AS MOOT.

The Clerk of the Court is directed to close this case forthwith.

DATED    September 24, 2012.

BY THE COURT:

_____

TED STEWART
United States District Judge